# PROVIDENT SAVINGS LIFE ASSURANCE SOCIETY *v.* GEORGIA INDUSTRIAL COMPANY.

1. A covenant in a security deed that the borrower is "to keep the improvements on said premises insured in company or companies acceptable to [the lender] against loss or damage by fire," in a stated amount, and "also to fully insure all buildings to be erected on the premises [thereby] conveyed, with loss, if any, payable to" the lender, is not a covenant to pay in advance the insurance premiums. If the borrower procures the issuance of insurance policies on his own credit, and delivers them to the lender agreeably to his obligation, the covenant to keep insurance is not broken until the insurance policies are cancelled by the insurance company. Where the policy stipulation was that it could be "cancelled at any time by the company, by giving five days notice of such cancellation," and in the "loss-payable clause" it was provided that the company reserved the right to "cancel this policy at any time, as provided by its terms, but in such case" the policy should "continue in force for the benefit only of the [lender] for ten days after notice to the [lender] of such cancellation," when it should cease, and that the insurance company should "have the right, on like notice, to cancel this agreement" relatively to the insured, the policy could not be cancelled by the insurance company without giving the five days notice to the insured.

2. A provision in a security deed for accelerating the maturity of the debt should not be so construed as to work hardship on the borrower, where there has been a bona fide effort on his part to comply with his covenant, and the circumstances are such that his efforts at compliance were apparently acceptable to the lender. In such a case, when there has been no waiver of the covenant by the lender, good faith requires

that he should, before undertaking to enforce the provisions of the deed accelerating the maturity of the debt for non-compliance with the terms of the covenant, afford to the borrower a reasonable opportunity to fully meet his obligations thereunder.

Argued October 5,—Decided November 20, 1905.

Injunction.   Before Judge Pendleton.   Fulton superior court. June 14, 1905.

On March 25, 1904, the Georgia Industrial Company borrowed $40,000 from the Provident Savings Life Assurance Society, giving its promissory note for that sum, payable three years after date, and secured by a loan deed covering a tract of land in Hancock county.   This deed contained the following covenants:   (I) So long as the indebtedness or any part thereof remained unpaid, the borrower was to pay all taxes, etc., and agreed "to keep the improvements on said premises insured in company or companies acceptable to [the lender] against loss or damage by fires or lightning, in the sum of at least thirteen thousand dollars ($13,000.00), and also to fully insure all buildings to be erected on the premises hereby conveyed, with loss, if any, payable to" the lender, or its assigns, "as their interest may appear, and that any tax assessment or premium of insurance not paid when due" might be paid by the lender, or its assigns, and any sum so paid should be added to the amount of the principal debt, and should draw interest from the time of payment at the rate of eight per cent. per annum and be covered by the security of this deed.   (2) The borrower further covenanted and agreed that "in case of any default in the due payment of interest upon said principal debt at and when the same shall become due, or the due performance of any of the covenants herein expressed to be performed by the [borrower], and a continuance of said default for a period of ninety days, the said principal note, together with any and all sums paid for account of the [borrower] in accordance with the provisions above set forth," should, at the option of the lender or its assigns, "then and thereby become due and payable forthwith, with accrued interest and all expenses and costs of collection," etc., time being of the essence of this contract.   (3) In case the debt secured by this deed should not be paid when it became due "by maturity in due course, or by reason of a default as above provided," then the lender or its assigns might "enter upon said premises and collect the rents and profits

thereof, and [might] sell the said property at auction, at the usual place for conducting sales at the court-house in the town of Sparta, in Hancock county, in said State, to the highest bidder for cash, first giving four weeks notice of the time, terms, and place of such sale by advertisement once a week in the newspaper in which the sheriff's advertisements for Hancock county are published, all other notice being hereby waived" by the borrower. In January, 1905, the Provident Savings Life Assurance Society gave notice to the Georgia Industrial Company of its election to call the loan, claiming that the covenant respecting the keeping up of insurance on the improvements upon the premises covered by the loan deed had been broken, and that the default had continued for a period of more than ninety days. Shortly thereafter the Assurance Society took steps to exercise the power of sale conferred upon it by the loan deed, and advertised the property for sale on the 7th day of April, 1905. On April 5, the Georgia Industrial Company filed a petition to enjoin this proposed sale of the property, alleging in its petition that there had been no default arising out of a failure on its part to comply with its covenants under the loan deed, and that the Assurance Society was proceeding, without right, to exercise the power of sale therein provided for. The court issued a rule nisi, and on the interlocutory hearing passed an order enjoining the sale. To the granting of this temporary injunction the Assurance Society excepts.

*J. H. Gilbert* and *W. H. Burwell,* for plaintiff in error.
*Walter McElreath* and *W. Cecil Neill,* contra.

Evans, J. (After stating the foregoing facts.) 1. It appears that shortly after the loan was negotiated, the Georgia Industrial Company delivered to the Assurance Society certain insurance policies, amounting in the aggregate to $13,000, containing a stipulation that any loss sustained thereunder should be payable to the Assurance Society, as its interest might appear. Some of these policies were issued by a firm of insurance agents without requiring the Georgia Industrial Company to first pay the premiums thereon. Subsequently repeated demands were made upon it to pay these premiums, which the company neglected to do. On July 12, 1904, the insurance agency notified a representative of the Assurance Society that the efforts made to collect the past-due premiums on

these policies had wholly failed, and that the companies issuing the policies had determined to cancel them for this reason. The representative of the Assurance Society requested the insurance agency to abstain from taking such action, and agreed in behalf of his principal that it "would hold itself responsible for, and would pay," the premiums on these policies, and also the renewal premium on another of the policies, which would expire on August 4, 1904, and which he requested the insurance agency to have "renewed in due course for the benefit of" the Assurance Society. The insurance agency assented to this proposal, and refrained from canceling the policies for non-payment of premiums, relying upon the promise made by the representative of the Assurance Society that it would assume responsibility for the payment of premiums. Neither the insurance agency nor any representative of the Assurance Society notified the Georgia Industrial Company of this understanding and agreement. On July 29, the insurance agency addressed a letter to the president of that company, giving notice that one of the policies would expire on August 4, and requesting him to fill out and return an enclosed application for its renewal. The president of the company did so, the policy was accordingly renewed, and the insurance agency thereafter called on the company for payment of the renewal premium of $170 and accepted from it a partial payment of $100 thereon. Subsequently the insurance agency, despairing of being able to collect from the Georgia Industrial Company the unpaid premiums on policies issued to it, called on the Assurance Society for payment of the same, and payment thereof was made by it through its representative on January 23, 1905. Between July 12, 1904, and the end of that year, its local representative had been from time to time advised by the insurance agency of its unsuccessful efforts to collect these premiums, and reminded that the policies were being kept in life in reliance upon the promise made in behalf of his principal that payment by it would be made when required by the insurance companies. He regarded the continued failure on the part of the Georgia Industrial Company to pay the insurance premiums as amounting to a breach of its covenant to keep the improvements on the premises covered by the loan deed insured as therein stipulated, and accordingly, on January 16, 1905, gave written notice to that company that inasmuch as it had failed to comply with this covenant, the Assurance Society

had elected to exercise its option to declare the loan to be due and payable forthwith, and that the company would "also be held accountable for all premiums of fire insurance paid and to be paid by the Society in connection with this matter." So far as appears, this was the first intimation the Georgia Industrial Company had that the Assurance Society had entered into any agreement with the insurance agency with respect to the payment of premiums. As late as January 3, 1905, the company was advised by a letter written by the secretary of the Assurance Society, and sent from its office in New York, that one of the policies would expire on the 15th of that month, and that the society would be "pleased to receive a renewal of the same, or other acceptable insurance, on or before that date." The Assurance Society now insists that the Georgia Industrial Company failed to keep up the required amount of fire insurance in compliance with its covenant, and that its default in this respect dates from the 12th day of July, 1904, since which time the requisite amount of insurance has been kept in life solely by reason of the society's agreement to pay premiums, and not upon the faith of any credit extended to the company by the insurance companies or their agents.

The policies of insurance which were issued to the Georgia Industrial Company were not invalid or ineffectual because of the non-payment of any premium, and could not become so until the insurance companies cancelled them pursuant to the terms therein expressed. When the insurance companies issued these policies without demanding payment in advance of the premiums, they became immediately binding; their delivery to the insured or its creditor at the instance of the insured was equivalent to an express waiver of prepayment of premiums. The insurance companies could thereafter cancel the policies only upon the terms and conditions of the contract with the insured as expressed in the policies. Each of them contained this stipulation: "This policy shall be cancelled at any time by the company by giving five days' notice of such cancellation." In the "loss-payable clause," it was provided that: "The company reserves the right to cancel this policy at any time, as provided by its terms, but in such case this policy shall continue in force for the benefit only of the Society for ten (10) days after notice to the Society of such cancellation, and shall then cease, and this insurance company shall have the right, on like

notice, to cancel this agreement." Under the terms of the policy, if there had been no "loss-payable clause" attached, the giving to the insured of five days notice of intention to cancel was a condition precedent to the cancellation of the policy. Where there is a "loss-payable clause," and it is sought only to cancel this clause, ten days notice must be given to the party to whom the loss is made payable. If the company desires to cancel the policy in its entirety, both as to the insured and as to the party who holds it as security, five days notice is required to be given to the insured, and ten days notice to the person named in the "loss-payable clause." No notice of an intention to cancel any of the policies was ever given to the Georgia Industrial Company prior to the date on which the Assurance Society announced its election to call the loan. The evidence warranted the conclusion that, up to that date at least, the insured was under the bona fide belief that the policies were still in force and were being kept in life upon the faith of the credit extended to it by the insurance companies through their agents. The notification given to the Assurance Society by the insurance agency of an intention to cancel the policies for non-payment of premiums was not notice to the insured; and the agreement between the Assurance Society and the insurance agency that, upon the assurance of the payment of premiums by the society, the policies would not be cancelled, could in no wise affect the rights of the insured under the policies, the insured not being a party to this agreement and being wholly ignorant of such an arrangement. The policies of insurance evidenced what was in the nature of a tripartite contract, and two of the parties thereto could not, by any such secret understanding between them, deprive the other party to the contract of any benefit assured to him thereunder. Otherwise it would be within the power of a mortgagee and an insurance company to secretly terminate the insurance and declare a default in a covenant by the insured to keep up insurance on the mortgaged property, when by the very terms of the insurance contract a default had not occurred. The borrower's covenant was to keep the improvements on the premises insured, not to pay the insurance premiums in advance. If the borrower procured the insurance in accordance with the terms of this covenant, the covenant was not broken because the insurance companies, after extending credit to the borrower instead of exacting cash payment of

the premiums, became dissatisfied because payment was unduly deferred and expressed to the lender an intention to cancel the policies for non-payment of premiums. The insurance companies had the right to cancel the policies upon giving to the insured five days notice of an intention to do so; but until this notice was given the insured, the policies were binding on the insurance companies and afforded to the lender all the protection with which they would have surrounded the lender had payment of the premiums been made in advance. As no notice of an intention to cancel the policies was given to the insured, they remained of force independently of the secret understanding between the insurance agency and the lender up to the time the loan was called on January 16, 1905. The lender could not proceed to sell the property pledged as security for the loan under the power of sale contained in the loan deed until a default in keeping up the insurance had occurred and had continued for a period of ninety days. The borrower was not in default because of non-payment of insurance premiums when the loan was called, and yet the property was advertised for sale on April 7, 1905, less than ninety days after the insured for the first time was informed of the lender's undertaking to guarantee payment of the insurance premiums if the companies which had extended credit to the borrower therefor would refrain from cancelling any of the policies and keep them in force for the benefit of the lender. The court below therefore rightly held that the failure on the part of the insured to pay the insurance premiums did not constitute a continuing breach of the covenant to keep the improvements on the premises insured for the protection of the lender.

2. The borrower's covenant was to keep up insurance, in an amount not less than $13,000, for the benefit of the lender, on the improvements upon the premises described in the loan deed. These improvements were not of such value as to enable the borrower to secure insurance thereon for that amount, and the lender did not, therefore, insist upon a literal compliance with the covenant. On the contrary, the lender, with knowledge that certain buildings belonging to the borrower were located on the right of way of a railway company, and not upon the premises covered by the loan deed, accepted policies of insurance taken out on these buildings for the lender's protection, and treated the insurance thus effected, in

addition to that represented by other policies tendered at the same time, as amounting to a substantial compliance with the terms of the covenant. Strict compliance therewith was therefore waived. One of the policies delivered by the Georgia Industrial Company to the Assurance Society was taken out on a dwelling-house which was neither located on the premises covered by the loan deed nor erected on land to which the company had title. The policy stipulated that it was to be regarded as void if the insured did not have the title in fee to the land on which the building was located. The Assurance Society contends, that, at the time it accepted this policy as security, it believed the house was located on the premises included in the security deed, and that its discovery that the dwelling-house was located on other land was made pending the present litigation. It further insists that as this policy was included among those making up the total amount of insurance covenanted to be effected and maintained, and as this policy was void from its inception and afforded the society no protection, the covenant of the Georgia Industrial Company has never beep kept, either literally or substantially. It is not denied that the land on which this house was built is not embraced in the tract described in the security deed, nor that the fee-simple title to the land is in one other than the insured. But evidence was submitted in behalf of the company, authorizing a finding that it had an insurable interest in the house, and that it acted in good faith in effecting insurance thereon and tendering the policy to the lender in an effort to comply substantially with the covenant to keep the improvements on the premises described in the loan deed insured to an amount not less than $13,000. The president of the Georgia Industrial Company deposed that, from certain facts narrated by him, he inferred that the Assurance Society had knowledge concerning the true location of this dwelling-house. The evidence offered in this connection was not such as to warrant the conclusion that the Assurance Society had actual knowledge of the fact that the house was not located on the premises included in the loan deed, but was sufficient to support the finding of the court that the insurance on this house was effected in good faith by the borrower in a bona fide effort to insure the lender against possible loss. The manifest purpose of the covenant to keep the improvements on the premises insured was for the better securing of the loan. If, in a bona fide effort to comply substan-

tially with this obligation, the covenantor, acting under the belief that the lender had signified a willingness to waive a strict compliance with the covenant, which was impossible of literal performance, tendered to the lender a policy taken out on a building in which the covenantor had an insurable interest, but which was not located on the premises described in the loan deed nor on land to which the covenantor had a fee-simple title, and the policy was accepted and retained by the lender without knowledge of the facts and with no intention to waive any right under the covenant, good faith on the part of the lender would require that it should, upon discovery that the policy afforded it no protection, return the policy to the covenantor and afford it an opportunity to substitute acceptable insurance, before arbitrarily declaring that the covenantor was in default and demanding an immediate payment of the loan. The contract contemplated that the borrower should effect insurance which was acceptable to the lender; the time for rejecting policies of insurance which were not acceptable was when the policies were tendered to the lender in an effort by the borrower to comply with the terms of the covenant. So long as the Assurance Society retained the policy taken out on the dwelling-house, the Georgia Industrial Company might well assume that the former recognized that there had been a substantial compliance with the terms of the covenant. Of course the Assurance Society, by retaining the policy in ignorance of the true state of facts, did not waive its right to exact compliance with the covenant; but when it discovered that the policy of insurance in its possession was upon property not included in the loan deed, it should have promptly offered to return the policy and made demand upon the covenantor to substitute therefor a policy which was acceptable, unless the Georgia Industrial Company had by deception and artifice perpetrated an actual fraud upon it by inducing it to accept the policy in the first instance, and was therefore knowingly and deliberately in default from the beginning of the transaction. The court below expressly ruled that, so far as this branch of the case was concerned, it should be made to turn upon the question of the good faith of the Georgia Industrial Company in effecting this particular insurance and tendering the policy to the Assurance Society. While provisions for accelerating the maturity of a secured debt are not generally to be regarded as in the nature of forfeitures, yet such provisions

should not be so construed as to work hardship where there has been a bona fide effort to comply with the obligations assumed by the borrower.  Rounsavell v. Crofoot, 4 Ill. App. 671.  The presiding judge found that the Georgia Industrial Company had acted in good faith in its efforts to keep its covenant; and he did not abuse his discretion in refusing to treat the partial failure to comply therewith as such a default as would give the Assurance Society an immediate right to exercise the power of sale, without offering to return the policy objected to and affording the covenantor a reasonable opportunity to substitute insurance which was satisfactory.

Judgment affirmed.    All the Justices concur.