## KENNESAW GUANO COMPANY *v.* MILES & COMPANY.

Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure, before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given the other of intention to rely on the exact terms

of the agreement. Until such notice, the departure is a quasi new agreement.

The evidence authorized the finding in favor of the plaintiff.

Argued January 6,—Decided June 22, 1909.

Complaint. Before Judge Roan. DeKalb superior court. April 25, 1908.

Edward O. Miles & Company brought suit against the Kennesaw Guano Company for $888.05 principal, on an account for tankage delivered, as stated in an itemized account attached to the petition. The defendant filed its answer, wherein it claimed damages against the plaintiffs because of their failure to deliver to the defendant the amount of tankage which they were under obligation to deliver under the contract between them. The defendant claimed that the plaintiffs were indebted to it the difference between the contract price of the tankage which they failed to deliver and its actual value, and asked judgment against them for an amount as shown by statement attached to the answer. The case was submitted to the judge without a jury. He awarded judgment against the defendant, and it filed exceptions. Upon the trial the following contract was introduced in evidence: "Atlanta, Ga., April 1st, 1898. This agreement between the Kennesaw Guano Company and Edward O. Miles & Company, witnesseth that said Miles & Company may render tallow from butcher bones (which they agree to do for twelve months from May 1st, 1898), on the premises of said Company at Clifton, Georgia, on the following conditions: Said Miles and Co. are to furnish all necessary appliances, and make all connections at their own expense, and said Company is to furnish steam (at such times as they may have steam on) at the rate of 1.00 for each rendering of not over five hours. Said Miles & Co. are to pay, for the use of said premises, 4.00 per month, and in addition thereto said Company is to have the option of buying at 8.00 per ton, when dry, all the by-product called tankage obtained in rendering tallow, which is guaranteed to be not less than ten tons per month, and to analyze not less than 4% ammonia and 35% bone phosphate. It is understood and agreed that said rendering is to be conducted in such manner as not to be offensive or inconvenient to said Company (who are to be the sole judge of this), and the liquor from each rendering is to be sprayed on the pile of ammoniated goods in the pit of said

Company, without expense to them, and the necessary pipes &c. for doing this thoroughly are to be furnished and connected by said Miles & Co. This arrangement or privilege may be cancelled at the end of any month by said Company giving said Miles & Company ten days notice." Indorsed on the contract was the following: "The within agreement is renewed to May 1st, 1900, subject to all the conditions named therein. This February 14th, 1899." The account sued upon by Miles & Company showed a delivery of tankage by them to the defendant company on the following dates in 1901: February 1, April 9, July 18, and Oct. 1. It was admitted upon the trial that this account was correct. The account attached to the answer of the defendant showed delivery of tankage under the contract on the following dates: Aug. 1 and Sept. 23, 1898, May 13, 15, Sept. 14, and Nov. 17, 1899, May 15 and Sept. 27, 1900, May 10, 1901, and June 2, 1902. The total amount of tankage shown to have been delivered under this statement amounted to 167 and a fraction tons. The amount which the defendant company claimed it was entitled to have delivered was 410 tons, leaving a balance undelivered of 242 and a fraction tons. It was admitted that the tankage shown by the statement attached to the answer to have been delivered was actually delivered by Miles & Co. Mr. Ashford, the president of the defendant company, testified: "As to what was done at the expiration of the second term of this contract, which was May 1st, 1900, there wasn't anything. I can't recall that anything at all was said about it. Edward O. Miles & Company did not remove their plant from the premises, but they continued there just as they had been doing, operating the plant, rendering tallow and making tankage. The tankage that was made was delivered to us at stated times; that is, at irregular times as they had accumulated enough to make a 'weighing,' as we called it. It was delivered to us when that had been done. There was no difference in the character of the business conducted by Miles & Company on the premises after May, 1900, and that conducted before that time. They vacated this place October 1st, 1901. I don't think they ever gave us any notice when they vacated; they just moved out. I don't remember that any notice was given at all. As a matter of fact I do not think any notice was ever given. I have been in the manufacturing business about twelve years. As to what is meant by tank-

·age: they gather up bones, scraps, and decayed meats that butchers put aside during the day. All of that has more or less tallow in it. They gather up so many pounds from one butcher and so many from another, so that every day there was a considerable quantity of it; may be several wagon-loads. Tankage is the stuff that remains after the tallow has been taken out. These bones were put into a steel tank that is air-tight, and steam is turned on, and it is cooked for several hours. When it cools down, the tallow rises to the top and is taken off. The residue is what is called tankage. It is a common product in the fertilizer trade. The large packers in Chicago have it in great quantities, and ship it down here. It is a well-known commodity, and is in demand by fertilizer manufacturers. I was engaged in the fertilizer business and buying it at that time. I am familiar with the market price. The market price of tankage at the mills in Atlanta between the dates of May, 1898, and October, 1901, varied as to grades. There are various grades. Sometimes it runs high in ammonia. That is the important ingredient that is sought in tankage. Tankage with 4% ammonia and 35% phosphate would have been worth at the time $13.50 to $14.00 per ton. That is the minimum price. . . I do not think there is any doubt about their having delivered to my company all of the tankage they made." Edward O. Miles testified: "Nothing was ever said to me by Mr. Ashford after the making of this contract, until October 1st, 1901, about a failure to deliver the tankage. From the time of the execution of this contract, April 1st, 1898, down to October 1st, 1901, the time the last car-load of tankage was delivered, they never said anything to me about demanding that we comply with the terms of the contract as to furnishing ten tons per month. We delivered all the tankage we had. During that time we made a number of settlements with the Kennesaw Guano Company. Settlements in full between us were made. They paid us in full the amount they owed us at each settlement. We settled, I think, two or three times a year. Whenever the tankage was dry, and the company was ready to receive it, they would notify us. They paid us for the tankage we delivered. These papers handed me are statements they rendered us of our account with them. This settlement was made April 29th, 1899. This statement shows the check enclosed for balance of $79.52. That was paid. This statement shows a balance due us of $278.80,

and a check was enclosed in the statement. This is a similar statement dated November 10th. This shows a balance of $185.58, which was paid by check enclosed. Here is a similar statement dated January 15th, 1900, which shows a balance of $3.99, which was paid by check enclosed." Elliott, a witness for the plaintiff, testified that from May 1, 1898, to October 1, 1901, he held the position of bookkeeper with the Kennesaw Guano Company, and further testified: "Yes; there was money paid to Miles & Company. I think it was paid two or three times a year during this period of three or four years. I think it was in the summer of 1902 that I gave up my position with them. What the Kennesaw Guano Company was paying Miles & Company was for tankage on these statements." Mr. Ashford, recalled, testified: "As to whether or not any settlement was made between me and Miles & Company under this contract between the date of its execution and October 1st, 1901, several settlements were made; according to these statements here. These statements simply represent what tankage was turned over to us upon that contract at stated times; and when that tankage was turned over, naturally they wanted money for it, and we made out a statement up to that date of the amount that was turned over, and the amount charged for steam, and $4.00 per month was deducted from that tankage, and a check sent to them. As to any closing up of accounts, there were various times when I didn't know whether he was delivering more or less than ten tons per month. . . I called attention to the fact that they were behind in the delivery of tankage as soon as I found out that there was any considerable arrearage. I called Mr. Miles' attention to it, and he said he was giving us all he could get, but possibly he might be able to buy some. My recollection is that he said he would endeavor to do so. The fact is that I expected considerably more than ten tons. . . I can not recall as to the date when I told him he was short. I told him that I noticed he had not been delivering as much as the minimum amount mentioned. I said that to Mr. Miles, but I don't remember when I said it. He was in my office. Mr. Miles is the only man I had anything to do with." Edward O. Miles, recalled, testified: "I do not remember Mr. Ashford ever saying anything to me about not furnishing ten tons of tankage, as he states, until I made a demand for payment for the dry bones shipped. As to when that

was I would have to refresh my memory. It was about the time I filed this suit."

*Wimbish, Watkins & Ellis,* and *Frampton E. Ellis,* for plaintiff in error. *Howard & Bolding,* contra.

HOLDEN, J. (After stating the foregoing facts.) Miles & Company brought suit against the Kennesaw Guano Company to recover the purchase-price of a quanity of tankage delivered to the defendant. The defendant filed an answer, setting up a failure on the part of the plaintiff to deliver the quantity of tankage guaranteed under a written contract between the parties (a copy of which appears in the statement of facts), whereby it was damaged in the amount of difference between the contract price and the market value of the deficiency in the amount delivered; and praying judgment accordingly. The court, to whom the case was submitted without a jury, rendered judgment in favor of the plaintiffs for the full amount sued for, and to this judgment the defendant excepted. In the judgment the court said: "The court is further of the opinion that the evidence discloses a mutual departure from the exact terms of the written contract by the paying and receiving money thereunder by the parties thereto, which constituted a quasi new contract." The original written contract between the parties, among other things, provided: "Said Miles & Co. are to pay for the use of said premises 4.00 per month, and in addition thereto said Company is to have the option of buying at 8.00 per ton, when dry, all the by-product called tankage obtained in rendering tallow, which is guaranteed to be not less than ten tons per month." The plaintiffs delivered to the defendant all of the tankage they made, which was less than the 10 tons per month guaranteed under the contract. The plaintiffs contend that the various settlements made between them and the defendant, and the payment by the defendant to the plaintiffs for the tankage delivered, which was less than the 10 tons per month guaranteed, and other conduct of the defendant, shows that there was a mutual departure from the terms of the original contract and a quasi new contract between the parties made, which relieved the defendant of the necessity of fulfilling the guarantee in the original contract of furnishing 10 tons per month. The Civil Code, § 3642, provides: "Where parties, in the course of the execution of a contract, depart from its terms and pay or receive money under such departure,

before either can recover for failure to pursue the letter of the agreement, reasonable notice must be given the other of intention to rely on the exact terms of the agreement. Until such notice, the departure is a quasi new agreement." The original contract began May 1, 1898. The plaintiffs did not vacate the defendant's premises and cease to operate its plant in the making of tankage until October 1, 1901. The plaintiffs furnished to the defendant all of the tankage they made. During these several years the defendant paid to the plaintiffs, two or three times each year, the amount due for tankage furnished by the plaintiffs to the defendant, as per statements rendered. According to the testimony of witnesses for the plaintiffs, nothing whatever was said, when these various settlements were made, about the failure of the plaintiffs to furnish 10 tons per month, as provided by the contract, or at any other time until about the time this suit was filed to recover for the last deliveries of tankage made by the plaintiffs to the defendant. This suit was filed June 7, 1902. These various settlements were made each year, and some of them occurred under the renewed and some under the original contract, and when they were made the guano company took from the value of the tankage delivered, computed at the contract price, the amount due by Miles & Company for rent and steam, and paid Miles & Company the difference. The tankage delivered was all Miles & Company made, and these settlements were made without the guano company making any complaint whatever that the guarantee provided for in the contract was not fulfilled, or that the amount delivered did not fulfill the guarantee provided for in the contract. While Miles & Company delivered all the tankage they made, they did not deliver the amount called for by the guarantee; and if Miles & Company, on account of any deficiency in the amount of tankage delivered, owed the guano company the difference in the market price and the contract price of such deficiency at the time these various settlements were made, then the guano company at such times did not owe Miles & Company anything, as the difference between the contract price and the market price of such deficiency would have been more, at the date of the respective settlements, than the amount due Miles & Company by the guano company as the contract price of the tankage delivered, less the amount due by Miles & Company for rent and steam. The record does not show

anything to indicate other than that both parties, at the time the various settlements were made, considered them as being an adjustment of all differences then existing between them. The contract imposed upon the parties thereto mutual obligations, requiring the guano company to furnish steam and a location for Miles & Company's plant, and on Miles & Company the obligation to pay rent and for the steam furnished, in addition to giving the guano company the option to buy tankage. In the execution of this contract, Miles & Company delivered to the guano company all the tankage they made, and the guano company received the same as it was delivered and paid therefor, after deducting the amount due by Miles & Company for rent and steam. We think that under the facts appearing in the record the court was not required, but was authorized, to find that in the course of the execution of the contract the parties departed from its terms, and paid and received money under such departure, as a result of which the plaintiffs were relieved of the duty to fulfill the guarantee provided for in the original written contract. In this connection, see Civil Code, §§ 3642, 3674, 5152; *Eaves* v. *Cherokee Iron Co.*, 73 *Ga.* 459; *Hasbrouck* v. *Bondurant*, 127 *Ga.* 220 (56 S. E. 241); *Provident Savings Life Assurance Society* v. *Georgia Industrial Co.*, 124 *Ga.* 399, 407 (52 S. E 289); *Southern States Phosphate &c. Co.* v. *Barrett*, 130 *Ga.* 749 (61 S. E. 731); *Mathis* v. *Harrell*, 1 *Ga. App.* 358, 362 (58 S. E. 207); *Bush* v. *West Yellow Pine Co.*, 2 *Ga. App.* 295 (58 S. E. 529); *Fitzgerald Cotton Oil Co.* v. *Farmers Supply Co.*, 3 *Ga. App.* 212, 216 (59 S. E. 713).

The original contract ended May 1, 1899. It was renewed by an agreement indorsed on it by both parties, to the effect that it was extended to May 1, 1900. The president of the defendant company testified: "As to what was done at the expiration of the second term of this contract, which was May 1st, 1900, there wasn't anything. I can't recall that anything at all was said about it. Edward O. Miles & Company did not remove their plant from the premises, but they continued there just as they had been doing, operating the plant, rendering tallow and making tankage. The tankage that was made was delivered to us at stated times; that is, at irregular times as they had accumulated enough to make a 'weighing,' as we called it. It was delivered to us when that had been done. There was no difference in the character of the busi-

ness conducted by Miles & Company on the premises after May, 1900, and that conducted before that time." We think that the conduct of the parties, after the expiration of the contract made in writing, was such as to renew such contract as it previously existed, and each of the parties was bound by the terms of such previously existing contract as modified by the mutual departure therefrom. In this connection, see *Hill* v. *Goolsby*, 41 *Ga.* 289, 291; *Roberson* v. *Simons,* 109 *Ga.* 360 (34 S. E. 604).

The defendant alleged in its plea that the premises were worth more for rent than the amount provided for in the contract, and offered the following amendment: "Defendant says that in the event it should be held by the court that the written contract between plaintiff and defendant was not extended as contended by defendant from May 1st, 1900, to October 1st, 1901, by mutual consent, and by the continued use and occupation of defendant's premises by plaintiff, that the defendant says that for the use and occupation of its premises from May 1st, 1900, to October 1st, 1901, plaintiff became indebted to defendant for the reasonable rental value of the premises, which defendant says was the sum of $50.00 per month." In view of the ruling above made, the court committed no error in refusing to allow such amendment.

*Judgment affirmed. All the Justices concur.*